1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

- - - - - - - - - - - - - - -X
CVS PHARMACY, INC.,     :  21-CV-00070(WES)
       Plaintiff,      :
                      :
                      :
                      :
     vs.              :  United States Courthouse
                      :  Providence, Rhode Island
                      :
                      :
                      :
TIMOTHY M. Brown,      :  Thursday, February 25, 2021
       Defendant.     :  Afternoon session
                      :

- - - - - - - - - - - - - - -X

TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
BEFORE THE HONORABLE WILLIAM E. SMITH
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Plaintiff:   GLENN M. CUNNINGHAM, ESQ.
                   Shipman & Goodwin LLP
                   One Constitutional Plaza
                   Hartford, CT  06103

For the Defendant:   SHANNON McDOUGALD, ESQ.
                   McDougald Law Group P.S.
                   400 108th Avenue NE
                   Bellevue, WA  98004

Court Reporter:   Lisa Schwam, CRR-RPR-RMR
                One Exchange Terrace
                Providence, RI  02903

1    (VIA VIDEO CONFERENCE)

2    25 FEBRUARY 2021

3         THE COURT:  All right.  Welcome everybody.  So

4    we're going to go on the record now.  This is the

5    matter of CVS vs. Brown.  And we're here for a hearing

6    on the motion for a temporary restraining order as well

7    as, I take it, also on the defendant's motion to

8    dismiss or transfer venue.  So let's have counsel

9    identify themselves.

10        MR. CUNNINGHAM:  Good afternoon, your Honor.

11   It's Glenn Cunningham from Shipman & Goodwin on behalf

12   of CVS Pharmacy, Inc., the plaintiff.  I do believe

13   that local counsel, Mr. McNamara, should be joining,

14   but it's okay.  I'll be doing the argument today, your

15   Honor.

16        THE COURT:  Very good.

17        MR. McDOUGALD:  Good afternoon, your Honor.  I'm

18   Shannon McDougald for the defendant, Mr. Brown.  And I

19   think local counsel is on as well as my colleague,

20   Trent Latta.

21        THE COURT:  Okay.  Very good.  Thank you.

22        Okay.  Well, I do have your papers, and I

23   reviewed much of what you filed.  I can't say I

24   reviewed every single page because I think it went up

25   to about 600 pages when I counted it up.  So I will say

1   that I think that it makes the most sense to me at this

2   stage for me to really hear from you on the personal

3   jurisdiction issue and the venue issue.  I think

4   there's a serious question of personal jurisdiction and

5   venue, particularly personal jurisdiction, that's

6   raised here.  And I'm also concerned about this

7   Washington State statute which plays into -- doesn't

8   play into personal jurisdiction, but it does have a

9   connection to venue as well as to the merits.  So I

10  want to hear about that.

11        That's a real -- as far as I'm concerned, that's

12  a very new sort of twist to these cases and is not

13  something that we've had a lot of experience with.  In

14  fact, this looks like a statute that only became

15  effective about a year ago -- a little over a year ago.

16  So I'd really like to focus on that.  And I think that

17  would be most helpful to me.  It's not that I don't

18  want to get into the merits, but, you know, as I look

19  at this, I actually think discussion of the merits may

20  well require an evidentiary hearing because it really

21  comes down to a battle of affidavits.  And it's very

22  hard for me to make a really informed and kind of

23  thorough assessment of what should happen here without

24  having those -- the testimony that's in those

25  affidavits subject to cross-examination so that I can

1    really kind of drill down on that.  And that's

2    obviously a more involved thing.

3         And if I end up agreeing with the defendant with

4    respect to personal jurisdiction and venue, it seems to

5    me that I should make that decision quickly and get the

6    case transferred to the District of Washington so that

7    -- because any judge that gets the case out in

8    Washington State is going to have the same reaction to

9    the briefing on the merits that I have, and he or she

10   is going to want to have an evidentiary hearing.  So I

11   think my -- and I'm happy to have you disagree with me

12   about any of this if you wish to, but I think that my

13   time is best spent doing as expeditious of an

14   evaluation of this jurisdictional and venue issue and

15   getting you a decision on that as quickly as I can.

16   And if it's to keep it, then we go into the merits.

17   And if it's to transfer it, it gives that judge a

18   chance to dig into the merits.

19        That's how I'm looking at this material, but I'm

20   happy to take your views about that.  So maybe,

21   Mr. Cunningham, you can go first.

22        MR. CUNNINGHAM:  Thank you very much, your

23   Honor.  And I appreciate you guiding us and giving us

24   some initial thoughts on where to focus, and we'll do

25   that.

1          I think, preliminarily, you're absolutely right,

2     you're hearing two very different stories about the

3     facts of this case.  And the issue before us today is

4     the TRO which would, I think, get us to the preliminary

5     injunction hearing where we can have a full vetting of

6     the information; we can have live witnesses, we can

7     cross-examine, so that the Court hears the entire story

8     and could assess that story.

9          So from our perspective, your Honor, that's

10    really what we're interested in today is making sure

11    that we have protection from now to whatever the next

12    proceeding is and wherever that is.  And I do think

13    that that proceeding belongs here with your Honor in

14    Rhode Island.  Maybe I'll just start with the

15    Washington statute because, frankly, having reviewed

16    it, I think we can dispense with that very quickly.

17         You know, that Washington statute, as your Honor

18    noted, is very new.  It's somewhat unique and so

19    there's not going to be a whole lot of case law about

20    that.  But we don't think that it applies at all.  And

21    there's a number of reasons for that, your Honor.

22         First, this action is governed by Rhode Island

23    law.  This is a breach-of-contract action.  And of

24    course, the Court sitting in diversity is going to

25    apply the forum state law, Rhode Island, to determine

1    the appropriate choice of law.  And the choice-of-law

2    provisions in Rhode Island, your Honor, are very clear;

3    the parties are permitted to agree to the law of a

4    particular jurisdiction.  And that comes directly from

5    the Rhode Island Supreme Court.  And Rhode Island, just

6    like most jurisdictions who follow the restatement,

7    recognize that those choice-of-law provisions are valid

8    and only under very limiting, rare exceptions, your

9    Honor, would that best choice-of-law provision not

10   apply.

11          And none of those exceptions are here.  That

12   would only be under Rhode Island law if the chosen

13   state, Rhode Island, bears no substantial relationship

14   to the parties and there's no other reasonable basis

15   for the parties' choice.  And the *Sheer* case, the

16   Supreme Court case in Rhode Island, recognized that we

17   get out of that exception very quickly if one or

18   another situation applies; and that is, if one of the

19   parties is domiciled where choice of law has been

20   chosen or the principal place of business of one of the

21   parties is in the state where the jurisdiction has been

22   chosen.

23          Of course, both of those issues apply here.  CVS

24   is both domiciled in Rhode Island, and they have a

25   principal place of business in Rhode Island.  So just

1    under straight Rhode Island choice-of-law provisions,

2    your Honor, or rules, your Honor, the choice-of-law

3    provision of Rhode Island, which was selected by the

4    parties in their agreement, certainly should apply.

5    And we think that dispenses with the Washington issue

6    straightaway.

7         But that said, your Honor, there are other

8    reasons why I don't think this Washington statute

9    applies.  And there is an initial question, and I don't

10   know how big of a deal it is but we have to raise it,

11   and that is a question of whether or not Mr. Brown is

12   currently domiciled in the State of Washington or not.

13   In preparing for today, we learned --

14        THE COURT:  Let me just redirect you, and I do

15   want you to get to that point in a minute, but just

16   since you began with the choice-of-law issue, I think

17   we should zero in on that.  And I'm looking at the

18   clause itself which says, "I agree that any claim or

19   dispute I may have against the corporation must be

20   resolved by a court located in the state."  I guess

21   this is more of a jurisdictional -- I guess it's the

22   sentence before that.  "This agreement shall be

23   governed by and construed in accordance with the laws

24   of the State of Rhode Island."  And then it has that

25   following sentence.

1          What I'm wondering about is, does this clause

2     when it's read as a whole, does it apply to an

3     action -- so is it really about actions by Brown

4     against CVS?

5          MR. CUNNINGHAM:  No, I think those are two very

6     separate issues, your Honor.  As your Honor noted, the

7     second sentence, that's the venue and personal

8     jurisdiction sentence.  So jumping ahead to personal

9     jurisdiction just very briefly, Mr. Brown has agreed

10    that Rhode Island has personal jurisdiction of him, at

11    a minimum, because of that very sentence as you pointed

12    out.

13         But if we look at the first sentence, your

14    Honor, what that is telling us is that the parties have

15    agreed that Rhode Island, Rhode Island law, will govern

16    this agreement.  That's the point, your Honor.  So this

17    Washington statute can't subvert the choice that the

18    parties made to have this agreement, this RCA, governed

19    by Rhode Island law.

20         THE COURT:  Okay.  So keep going.  You were on

21    the issue of where he is living.

22         MR. CUNNINGHAM:  Right, your Honor.  And again,

23    this may or may not be an issue, but certainly we found

24    out on Tuesday that just prior to resigning from CVS, I

25    believe it was on January 26th, and before we filed the

1    action, Mr. Brown had sent a notice to the CVS payroll

2    HR group notifying them of the change of address for

3    tax purposes and for payroll purposes, and that change

4    of address was to an address down in Scottsdale,

5    Arizona.  We did a little checking quickly on publicly

6    available records.  It turns out that Mr. Brown does

7    own property in Scottsdale, Arizona, that syncs up with

8    his change request.

9         And we also noted that under publicly available

10   records he has apparently put his residence in Seattle,

11   Washington, up for sale, and there is an offer to

12   purchase that residence in Seattle.  So we don't know

13   how long he's there, we don't know how long he's going

14   to be there -- I'm sure Mr. McDougald can enlighten us

15   on that -- but we certainly wanted to bring that to the

16   Court's attention because that may take care of a lot

17   of these issues upfront.

18        Leaving that aside, your Honor, just talking

19   about this Washington statute, even if we were to

20   ignore the parties' choice of law of Rhode Island, the

21   Washington statute is not retroactive.  It does not

22   change the parties' agreement specifically.  It is not

23   retroactive on its face.  And even if it does control

24   this particular case, the agreement doesn't apply by

25   its own terms.

1          The Washington statute, your Honor, specifically

2     excludes from the definition of a noncompete agreement

3     an agreement that was entered into regarding ownership

4     of one of the parties, which is precisely what we have

5     here, your Honor.  I just want to get that language in

6     front of me so that we can look at it together.

7          And what the Washington statute says, your

8     Honor -- this is in a definitional section under

9     definition number 4 -- it defines noncompetition

10    covenants, and it specifically says halfway through, "A

11    noncompetition covenant does not include a covenant

12    entered into by a person purchasing or selling the

13    goodwill of a business or otherwise acquiring,

14    disposing of an ownership interest."

15         Well, as you know, your Honor, this agreement

16    was entered into as part of an equity award in CVS.

17    That was part of an ownership interest in CVS.  By the

18    express language in the Washington statute, we contend,

19    your Honor, that the agreement is not covered by the

20    Washington statute.

21         Furthermore, even if it is, your Honor, there's

22    nothing in the statute applied to the facts of the case

23    that would invalidate the entire restrictive covenant

24    agreement.  There is a section within the statute that

25    says when an agreement is void and unenforceable.  None

1    of those provisions apply here so we're outside all of

2    those sections within the void and unenforceable

3    agreement.  The only possible provision in here that

4    would apply is dealing with what's called unenforceable

5    provisions where it says a provision, not the entire

6    agreement, but the provision in the noncompetition

7    covenant, signed by an employee or independent

8    contractor who is Washington based -- again, that's

9    still a question -- is void and unenforceable if it

10   requires the employee to adjudicate a noncompetition

11   covenant outside of the state.

12        So when you boil it all down, your Honor, that's

13   the only provision in this statute that may have any

14   applicability to our situation.  And that's because of

15   that venue personal jurisdiction sentence you pointed

16   out in Section 19 of the agreement that says that if

17   Mr. Brown has a claim against CVS, he needs to bring

18   that up in Rhode Island.

19        THE COURT:  But that's a pretty important

20   provision.

21        MR. CUNNINGHAM:  Well, it can be, your Honor.

22   We'll get to personal jurisdiction and to venue, but

23   the point is --

24        THE COURT:  Let's zero in on that part of the

25   provision.  You know, its plain meaning would suggest

1  that the contract is void by virtue of the

2  choice-of-law provision that you just pointed to,

3  doesn't it?

4       MR. CUNNINGHAM:  No, not at all, your Honor.

5  The statute is very specific that all this statute does

6  is it voids out that provision.  It specifically says

7  unenforceable provisions.  It's not the entire

8  agreement.

9       THE COURT:  Read it again.

10       MR. CUNNINGHAM:  Certainly, your Honor.  It

11  says -- so it's under the heading "Unenforceable

12  Provisions."  And it says, "A provision in a

13  noncompetition covenant signed by an employee or

14  independent contractor who is Washington based is void

15  and unenforceable; one, if the covenant requires the

16  employee or independent contractor to adjudicate a

17  noncompetition covenant outside of the state."  So it

18  only invalidates, if anything, that second sentence in

19  Section 19 that says that Mr. Brown would have to bring

20  a claim against CVS in Rhode Island.

21       By the way, your Honor, the statute doesn't say

22  that CVS on its own -- let's just presume, for the sake

23  of argument, that that second sentence didn't exist in

24  Section 19.  Nothing in the Washington statute says

25  that CVS on its own can't commence an action against a

1    Washington-based employee in Rhode Island or anywhere

2    else.  It doesn't prohibit that.  It just says you

3    can't force the employee to do so.  That's all that's

4    covered.  That's why I think when we drill into this,

5    your Honor, it really is an interesting discussion that

6    doesn't really have an impact on this case.

7         THE COURT:  Okay.  Well, let me just be clear

8    that at a minimum you would concede if it does apply,

9    then it makes the provision in the contract, which we

10   were just referring to a moment ago, the one

11   that -- actually, both sentences of the agreement, it

12   would make both of those sentences unenforceable,

13   wouldn't it?

14        MR. CUNNINGHAM:  No, your Honor, I don't agree

15   with that.  I think it would, at most, only make -- we

16   would have to strike out, which of course the agreement

17   allows you to do, we would have to strike out the

18   second sentence of Section 19.  That's it.  That's it.

19        And your Honor, I just have to say, I think it's

20   a very big leap to say that this Washington statute

21   governs this litigation where the Court is sitting in

22   diversity, where we have a Rhode Island choice of law

23   that was relied upon by CVS, where the State of Rhode

24   Island has substantial public policy interests in being

25   able to have its citizens enforce laws and bring

1  actions within the State of Rhode Island and as we --

2  our quick research where these issues have come up --

3  Sixth Circuit has the leading decisions on this -- the

4  Sixth Circuit has said in sort of analogous situations

5  -- actually, with California which has a straight ban

6  on noncompetes, essentially, California can do what it

7  wants to do, but it can't tell Ohio or other states in

8  the Sixth Circuit what they're going to do.

9       And we're faced with that issue here, your

10  Honor.  At a certain level it creates a conflict.  But

11  I don't believe that Washington can have a super

12  national law that's going to tell us in Rhode Island

13  what we can and can't do, especially when the parties

14  have agreed that Rhode Island law applies.

15       THE COURT:  Yes.  Well, I mean, it raises a

16  peculiar problem.  Now, I apologize, so let's just -- I

17  want to go back over this and make sure I understand

18  your reasoning.

19       So if I were to agree with you that the

20  provision of Washington law that we're talking about,

21  that it only applies to provisions and not to make the

22  entire agreement void, but if I were to agree with

23  that, but it says it makes a provision unenforceable if

24  the covenant requires the employee to adjudicate a

25  noncompetition covenant outside of this state.

1      So you're saying the second sentence of the

2  agreement is the part that would be made unenforceable,

3  but the choice of law would remain in effect.  That's

4  your point.

5      MR. CUNNINGHAM:  That's correct, your Honor.

6  And just again, because this is such a new statute I

7  think for everyone, we started with the definitional

8  section in the statute that by its express terms takes

9  our situation out of the statute.  That's the

10  definition of a noncompetition covenant.  Because it

11  says -- it's specifically excluded from the statute --

12  is an agreement where it was entered into with regard

13  to the acquiring or disposing of an ownership interest

14  in a company.

15      THE COURT:  I understand your argument there.  I

16  would have a question about whether that provision

17  applies to this type of a -- was meant to apply to this

18  type of a situation.  Again, I suppose that's another

19  reason why one can say a court in Washington State

20  ought to be answering that question, not a court in

21  Rhode Island.  But I understand your argument.

22      MR. CUNNINGHAM:  Right.  And I suppose CVS's

23  position, your Honor, would be, we shouldn't have to go

24  to Washington to resolve a dispute over a Washington

25  statute when we agreed that Rhode Island law would be

1    applying to this agreement.  That was the benefit of

2    the bargain.  We gave him a substantial amount of

3    equity; he accepted it.  He knew what he was doing;

4    he's a sophisticated guy.  And now suddenly, you know,

5    a statute that comes into play after the agreement was

6    entered into is now going to have retroactive effect

7    and send us to Washington?  That's certainly not what

8    the parties had expected when this agreement was signed

9    back in 2019.

10        THE COURT:  Okay.  I think you really ought to

11    get into the personal jurisdiction question because to

12    me that's a much more traditional analysis, and I

13    actually think you've got some issues there.

14        MR. CUNNINGHAM:  Okay, your Honor.  Thank you.

15    And I'm happy to talk about that.

16        You know, of course, our position is the Court

17    does have personal jurisdiction over the defendant at

18    this stage of the action where we're not having an

19    evidentiary hearing that tested the prima facie test

20    that we're all familiar with.  And the First Circuit

21    test there, you know, has three sections to exercise

22    specific personal jurisdiction.

23        The first, of course, is the relatedness test.

24    And these claims, your Honor -- I don't think there's

25    much debate over this -- these claims brought against

1    the defendant relate to Mr. Brown's contacts with Rhode

2    Island.  I mean, they arise directly out of an

3    agreement that was entered into between Mr. Brown and a

4    Rhode Island domiciled corporation that has a Rhode

5    Island principal place of business that gave Mr. Brown

6    equity in the Rhode Island principal place of business

7    organization in exchange for the covenants that we now

8    claim he's breaching.

9          And in addition, your Honor, there's a Rhode

10   Island choice-of-law clause and under the *Astro-Med*

11   case, the First Circuit decision, that Rhode Island

12   choice-of-law clause alone is sufficient to satisfy the

13   relatedness prong of the prima facie test, your Honor.

14   You know, that's our position with regard to

15   relatedness.  Of course, the second issue is purposeful

16   availment.  The test there, essentially, is did the

17   defendant voluntarily take action that made it

18   foreseeable he might be required to defend himself in

19   Rhode Island?  And of course, a physical presence is

20   not necessary.

21         I think the answer to that question, your Honor,

22   was it foreseeable that he would have to adjudicate the

23   case in Rhode Island, is unequivocally yes.  Again,

24   Mr. Brown is a sophisticated person who has been

25   negotiating contracts for decades.  He entered into a

1    direct relationship, a direct contract, with CVS, which

2    is domiciled and has a principal place of business in

3    Rhode Island.  He did so knowing many months after CVS

4    had acquired Aetna where the Medicare Advantage program

5    is housed.

6           So he knew that CVS owned Aetna at that point.

7    And he accepted stock in CVS, your Honor, nearly

8    $100,000 worth of stock in CVS.  On top of that, he was

9    selected for a leadership training program -- that's

10   CVS, it's not just Aetna -- where he voluntarily went

11   to Rhode Island for four days to be trained on that.

12          And last, but not least, and this may be the

13   most important point, your Honor, if we go back to that

14   Section 19, he agreed that if he had a claim against

15   CVS, he would bring that in Rhode Island.  Any kind of

16   a claim, not just a noncompete claim.  If he had a wage

17   and hour claim or some other type of claim, whatever it

18   may be, he agreed he would bring that in Rhode Island.

19          That was the bargain that was struck.  He

20   accepted the stock.  He accepted the consideration.

21   Therefore, it had to be foreseeable for him that he

22   might have to litigate a case in Rhode Island, your

23   Honor.  So again, I don't think there's any question

24   but that the purposeful availment prong has been met.

25          And once again, you know, the law in the circuit

1    is a choice-of-law clause alone is indicative of the

2    fact that someone has purposely availed themselves of

3    jurisdiction in Rhode Island.  And so, your Honor, if

4    those two prongs are met, that gets us to the five

5    Gestalt factors.  You know, the defendants -- we look

6    first at the defendant's burden in appearing.  Again,

7    the most important part of that is he agreed to the

8    personal jurisdiction in Rhode Island.

9         And given certainly all the circumstances that

10   we all live in these days, I don't think the burden of

11   appearing in Rhode Island is any different than

12   appearing in Washington, if that's where he still is.

13   That issue still needs to be resolved.

14        Second, and this is, I think, very important,

15   your Honor, is Rhode Island's interest in adjudicating

16   this dispute.  CVS is a Rhode Island company.  And CVS

17   gave its stock, ownership in itself, to Mr. Brown.  And

18   it expects Mr. Brown to abide by his commitments.  And

19   it has the right, because it negotiated for it, to have

20   an action adjudicated in its own State of Rhode Island.

21   Again, CVS is only seeking the benefits of the bargain

22   that it struck with Mr. Brown.

23        THE COURT:  Let me interrupt you there because,

24   again, this gets to -- I mean, we kind of go in circles

25   here and it's hard to know which question to take up

1  first, but let's just assume, just for discussion for a

2  moment, that I agree with Mr. McDougald that this

3  Washington law does apply.  Then that creates a kind of

4  anomalous situation where I would be -- if I were to

5  accept your arguments, I would be using a provision

6  that, for purposes of analyzing purposeful availment,

7  that Washington law says should not be applicable, that

8  is, the choice-of-law aspect of the agreement.

9         So it seems to me that I have to answer that

10  Washington law question.  If I answer it, that it does

11  apply, if I don't accept your argument that this equity

12  provision provides an exception to it and I say it does

13  apply, then it seems to me that the choice-of-law

14  aspect of the agreement has to be disregarded for

15  assessing personal availment.  And if that is

16  disregarded, then what we're left with, and if I'm

17  hearing your arguments correctly, are essentially the

18  fact that, you know, he worked for a Rhode Island

19  corporation, he got paid by this Rhode Island

20  corporation, he accepted the money from the Rhode

21  Island corporation, and he came to Rhode Island for a

22  training session, one trip.  That seems like a pretty

23  thin read when all of his work -- when the actual work

24  that he was doing was all in the Pacific Northwest.

25  The work that he was doing wasn't, you know -- it

1    wasn't as if he was focused on the territory of New

2    England but lived in Seattle or something; it's not a

3    situation like that.

4          So I really recognize, you know, why you would

5    say why the Washington statute doesn't apply and I

6    should consider the choice-of-law provision, but let's

7    just say it's out of the picture, then it doesn't look

8    too good for purposeful availment.

9          MR. CUNNINGHAM:  Well, your Honor, with all due

10   respect first, even if the Washington statute would

11   apply, it does not void out the choice-of-law

12   provision; it only voids out the personal jurisdiction

13   venue provision.  So the choice of law, Rhode Island

14   law, would still apply to the agreement.  The

15   Washington statute does not --

16         THE COURT:  I understand that, but you were

17   arguing that the choice-of-law provision should be

18   considered for purposes of evaluating personal

19   jurisdiction.  So not just applying the choice of law,

20   but that it should be given weight for purposes of

21   examining personal jurisdiction.  And that strikes me

22   as perhaps violating the Washington statute.

23         MR. CUNNINGHAM:  I guess I'll just respectfully

24   disagree on that, your Honor.  I don't think it

25   violates the Washington statute at all.  And what I was

1    really saying was that the First Circuit recognizes

2    that the parties' choice of law is indicative of the

3    fact that someone has purposefully availed themselves

4    of that state.  That's really the point there.

5          But, your Honor, it's also much more than that.

6    We have to go back in time.  The Washington statute

7    came into effect in 2020.  The question here is

8    personal jurisdiction and whether it was reasonably

9    foreseeable that the defendant would have to engage in

10   litigation in Rhode Island.  And I think we have to

11   look at that at the time the agreement was entered into

12   back in 2019 when there was no Washington statute.

13         If we look at the situation there, you know,

14   these are the basic facts.  CVS purchased Aetna.  CVS

15   offered to Mr. Brown -- and he knew CVS had purchased

16   Aetna; that was no surprise to anyone.  CVS made an

17   offer to Mr. Brown which is would you -- here is an

18   equity grant, an ownership interest in a Rhode Island

19   company as a principal place of business in Rhode

20   Island, that has a subsidiary called Aetna now that

21   you'll be performing services for.  Do you want the

22   equity?  If so, you have to agree to the provisions in

23   the restrictive covenant agreement which include Rhode

24   Island choice of law, and it included an agreement that

25   if he had a claim against CVS -- and by the way, this

1    stays in effect regardless of the Washington statute

2    which only applied to noncompete agreements -- but if

3    he has, like I said, a wage claim, your Honor, you

4    would have to bring a wage claim in Rhode Island.

5         So he knew that.  He agreed to that.  That's

6    foreseeable that he would be hailed into court in Rhode

7    Island.  That's why I say I think from purposeful

8    availment, was it foreseeable that he might be required

9    to defend himself in Rhode Island?  Of course it was.

10   And he agreed to that.

11        The fact that he lives in Washington, his region

12   was eight states, your Honor.  It was all of the

13   Pacific Northwest and Mountain Region.  It was eight

14   states.  He happened to live in Washington, but his

15   area of coverage was much broader than Washington.  So

16   I guess that's a rhetorical question.  Do we have to

17   sue him in Oregon or Nevada because he had

18   responsibility for those?

19        You know, there should be some certainty for

20   CVS.  That's what they bargained for, that's what they

21   received, that's what Mr. Brown agreed to.  I think

22   from a personal jurisdiction standpoint, it's

23   absolutely foreseeable that he would have to defend

24   himself in Rhode Island.

25        THE COURT:  Okay.  Well, thank you,

1    Mr. Cunningham.  Let me give Mr. McDougald a shot at

2    this.

3              MR. CUNNINGHAM:  Thank you.

4              MR. McDOUGALD:  Thank you, your Honor.

5         I have the good news of not going to require a

6    lot of genuflecting to get to the point.  The

7    Washington statute is unequivocal.  And we have argued

8    that, again, employers, if you're employing people in

9    the State of Washington, this statute applies to you.

10   All the dancing and arguments you heard from counsel

11   are made to the legislature.

12        And again, your Honor, why did this happen?  It

13   happened because Washington, like many states in

14   multiple industries, has a lot of employees based in

15   Washington who have employers who are foreign

16   corporations, not just foreign states, but also

17   international.  And the legislature made the decision

18   that those folks were not going to be required to have

19   disputes with their employers done in Asia, done in

20   other states, and any employer who came in had notice

21   of that.  And the statute is very clear; it said any

22   claim filed after January 1, 2020, any claim.

23        There is no question that the statute is there.

24   There is no question that Mr. Brown is a Washington

25   resident.  We've had this unusual comment on we think

1    he may not be a Washington resident, your Honor.  In a

2    word, that's incorrect.  He lives in West Seattle, your

3    Honor.  When his son was going to Arizona State

4    University, he bought a condo in Arizona for his son to

5    live in because it was actually cheaper than putting

6    him in the dorms.  They've kept it; they use it as a

7    vacation home.  And when they decided to sell their

8    West Seattle home, they used that address for their

9    mailings for a short period.

10         The reason he's moving from West Seattle, as

11   your Honor may know, there's one bridge from West

12   Seattle into downtown Seattle making it a ten-minute

13   trip.  That bridge was condemned federally two years

14   ago and won't be rebuilt for about another three years.

15   Most folks in West Seattle are moving south for cheaper

16   homes and the fact that they don't want to have to

17   drive an hour to get off their little peninsula.

18         This was not Mr. Brown trying to fool the Court.

19   He's lived in Washington.  One of his oldest children

20   lives in Washington as well.  His family's here.  He's

21   always been a Washington resident.  He is not an

22   Arizona resident.  Period, end of story on that issue.

23         Personal jurisdiction.  Your Honor, you had

24   pointed out correctly he made one trip to Rhode Island.

25   He worked for Aetna, a subsidiary of CVS.  He did not

1    purposely avail himself of the benefits of being a

2    Rhode Island citizen.  Nothing he's done has indicated

3    he expected and participated and has the kind of

4    minimum contacts we typically ask for in a circumstance

5    of personal jurisdiction.

6         Nothing presented today indicates that venue in

7    a state where he doesn't live is appropriate in this

8    case based on the actual evidence, based upon the

9    statute in Washington and based on their contract.

10   You'll recall, your Honor, when you were kind enough to

11   give us a little time early on, we were told venue was

12   appropriate because of the contract.  Like the Court, I

13   read the contract.  The contract says at paragraph 19,

14   if you sue CVS, you'll agree you'll sue them in Rhode

15   Island.

16        I know this isn't lost on the Court.  Mr. Brown

17   is being sued; he has not made a claim against CVS.

18   And of course, I would argue that even if he wanted to,

19   that would have to be in Washington.  But again, their

20   own contract, which they prepared, created venue in

21   Rhode Island under one circumstance, and that

22   circumstance, your Honor, doesn't exist here.  And

23   moreover, it's inconsistent with Washington law.

24        THE COURT:  So let's just break it down so I

25   make sure I understand your position.  Your position

1    would be that the contract itself requires only

2    adjudication of the case in Rhode Island if Mr. Brown

3    was suing the company.  And that provision of the

4    contract interpreted in that fashion would be

5    unenforceable, in any event, under this provision of

6    Washington -- of the new Washington statute because it

7    explicitly says that any provision that requires

8    adjudication in a state other than Washington is

9    unenforceable.

10        MR. McDOUGALD:  Right.

11        THE COURT:  Otherwise, plaintiff would say that

12   none of it even applies because of the equity issue.  I

13   want you to get to that.

14        But if that's all correct, then basically it's

15   all kind of a wash, and all that's left in the contract

16   is the first sentence of that provision which says that

17   the law of Rhode Island would govern.  And I don't hear

18   you saying that this provision of the Washington

19   statute would make that provision unenforceable; is

20   that correct?

21        MR. McDOUGALD:  Your Honor, I would argue that

22   that is potentially unenforceable as well.  Because

23   under the Washington statute, they want courts in

24   Washington to review the issue under Washington law as

25   well as the contract.  I have indicated before, I'm not

1    confident any portion of this particular agreement will

2    be enforceable, but I would argue that Washington

3    statute would say applying a choice of law for a

4    Washington resident, requiring them to have to accept

5    Rhode Island law as well as Rhode Island venue in that

6    contract, would potentially be unenforceable under the

7    statute.  But I would also argue that that's a review

8    that would have to be done by a Washington court.

9            THE COURT:  Okay.  All right.  So if this case

10   were transferred, it would be a Washington court using

11   Washington -- this is almost like a law school exam.

12   Washington choice-of-law principles, then deciding

13   whether Rhode Island law applies or Washington law

14   applies to the interpretation of this noncompete.

15   That's your position?

16           MR. McDOUGALD:  It is, your Honor.

17           THE COURT:  Now, what do you say to their

18   argument that the statute doesn't apply at all because

19   of the provision that excludes equity purchases?

20           MR. McDOUGALD:  Yes.  Your Honor, it is a

21   creative argument, but what that exclusion exception

22   had to do with was people who were selling businesses

23   between one another and agreeing to either arbitrate or

24   litigate outside the state in connection with the sale

25   of business.

1          Remember, this statute came up with respect to

2     people who were employed by primarily technology

3     companies who got compensation in part as stock in

4     equity provisions.  The legislature did not say, by the

5     way, you can claim this was not in the statute.  You

6     can claim that this exception applies to you because

7     you're fighting over a stock option or restricted

8     stock.

9          It simply wasn't part of the statute and that is

10    not -- if that were the purpose, it would mean that

11    most of us who would work with a publicly traded or

12    stock company would always be able to be pulled up by

13    the state.  That's exactly inconsistent with the

14    statute.  Again, a creative argument, but inconsistent

15    with the language of the statute.  And that particular

16    exception is simply not there.

17          THE COURT:  Okay.  So circle back then to the

18    whole personal jurisdictional argument.  You heard what

19    Mr. Cunningham had to say with respect to the factors

20    in a particularly purposeful availment.

21          MR. McDOUGALD:  In this particular case, your

22    Honor, when we go through the factors, first, we ask

23    ourselves, what really occurred?  Mr. Brown worked for

24    Aetna.  Aetna gets acquired after he's employed by CVS.

25    Aetna isn't trying to enforce an agreement with him or

1    trying to pull him to, by the way, where they're

2    incorporated which is Connecticut.  Their parent

3    company is arguing that by virtue of accepting his

4    compensation, he knew he would be dragged and could be

5    dragged to Rhode Island.  And the only indicia of that

6    that they argue is their contract, which we've talked

7    about the provisions.

8          What about that said he understood the burden?

9    The answer is nothing.  When we go to the facts of his

10   compensation, he has two pieces to it; he has his basic

11   compensation, he has a bonus and incentive plan.  He

12   had that with Aetna.  The only difference was when CVS

13   became the parent, they said you're getting CVS as

14   opposed to an equity grant because Aetna doesn't exist

15   anymore; it's now owned by CVS.

16         Nothing about that transaction told him he was

17   going to have minimum contacts with Rhode Island, that

18   he was going to avail himself of the benefits of Rhode

19   Island, that he would do business in Rhode Island.  And

20   your Honor, as you've pointed out, all of his work was

21   based in Seattle for the Western region.

22         THE COURT:  Let me press back on you a little

23   bit on that point because, you know, as Mr. Cunningham

24   said, I mean, this isn't an unsophisticated person

25   you're dealing with.  You're talking here about a

1    sophisticated business person.  I think we can assume

2    that he's someone who reads contracts before he signs

3    them, contracts that he is entering into, so presumably

4    he read this contract.  The contract states flatly that

5    you are subject to the laws of Rhode Island and if you

6    have a dispute with the company, you have to bring it

7    in Rhode Island.  And he's given his stock option bonus

8    and told explicitly that if you accept this, you're

9    accepting the terms of this agreement.

10         So by doing that, he's doing something very

11   conscious and very clear that says I understand that

12   Rhode Island is where I am.  I'm hitching my trailer

13   here in Rhode Island when he did that.  It's not like

14   something he might have missed or something that

15   happened that he didn't think about.  And then you add

16   on top of that that, you know, he knows it's a Rhode

17   Island corporation.  He accepts his paychecks from a

18   Rhode Island corporation.  And then he comes here to do

19   the training session.  So why isn't that enough?

20         MR. McDOUGALD:  I would say again, your Honor, I

21   don't think it meets the standard, but let's assume he

22   reads it thoroughly not just as a business person, but

23   as a lawyer.  If you read paragraph 19, it would tell

24   him, if I bring a claim, I am going to have to bring it

25   to Rhode Island.  It does not tell him if my employer

1    sues me, I'm going to Rhode Island. So no matter what,

2    however he read it, he's not saying I'm in Rhode Island

3    no matter what. I'm only coming if I want to make a

4    claim if that is my requirement. It doesn't tell him

5    he's subject to being pulled to Rhode Island for any

6    and all claims against him by CVS or anyone else by

7    their own contract language. So he never gets that

8    notice and never agrees to it.

9           THE COURT: I suppose you could say implicit in

10   the wording there is that -- it says if I sue CVS, I

11   have to do it in Rhode Island, but, implicitly, I guess

12   if I get sued by CVS, it could be anywhere. Rhode

13   Island --

14          MR. McDOUGALD: Where I live, where I work,

15   right.

16          THE COURT: Okay. But it doesn't explicitly say

17   it will be in his home court. It could be either one.

18          MR. McDOUGALD: With the exception of, again, in

19   this particular case, there is no question that CVS

20   prepared the agreement and, as a result, they were in

21   the position to know what they wanted.

22          And I would suggest, your Honor, that that

23   limitation was not put there for the benefit of

24   employees; it was put there because CVS recognized you

25   can't pull everyone here when you want to sue them. We

1    understand that, but if you want to sue us, we're going

2    to pull you here.  And that's why we have this very

3    specific language for a multibillion-dollar company

4    with, as you can tell by Mr. Cunningham, they're able

5    to hire good legal talent.

6            THE COURT:  Okay.  All right.  Thank you.

7            Mr. Cunningham, do you want to respond?

8            MR. CUNNINGHAM:  Just on a couple of points,

9    your Honor.

10           First, we need to recognize that this was a

11   substantial transaction between CVS and Mr. Brown.  The

12   value of those restricted stock units in CVS was nearly

13   $100,000 with a CVS company stock in a Rhode Island

14   company.  The fact that there isn't an exclusive venue

15   provision in there, it doesn't have to be an exclusive

16   venue provision in order for there to be personal

17   jurisdiction.  The question is whether or not the

18   purposeful availment, it's foreseeable that he could

19   have to litigate a case in Rhode Island.

20           And I believe the law backs this up, your Honor.

21   If you enter into an agreement with a company that is

22   domiciled in Rhode Island, that has a principal place

23   of business in Rhode Island, if you go to visit them

24   for leadership training in Rhode Island, if you accept

25   a hundred-thousand dollars worth of their stock in

1    Rhode Island, and you understand that because on the

2    cover page to the agreement it says as a condition of

3    accepting your 2019 equity award, you are required to

4    review and electronically sign this agreement and, by

5    the way, it says, if you have any questions, call human

6    resources.

7            THE COURT:  The characterization of the question

8    I think you were making is a bit of an

9    oversimplification.  And I'd just read to you from what

10   the case law says.  And I agree, it's voluntary and

11   foreseeable, but the First Circuit has said it's akin

12   to a rough quid pro quo; that is, when a defendant

13   deliberately targets its behavior toward the society or

14   the economy of a particular forum, the forum should

15   have the power to subject the defendant to judgment

16   regarding his behavior.

17           And as I said in a prior -- well, maybe it

18   wasn't me, another judge before my time on the

19   court -- it's a decision by the defendant to inject

20   himself into the local market.  So I agree with you

21   that the circuit has talked about in *Astro-Med* the

22   voluntary nature and the foreseeability, but there has

23   to be some kind of a deliberate or a conscious

24   initiative on the part of the defendant, it seems to

25   me, to inject himself into the economy.

1          Now, what you've got here is the acceptance of

2     money, both the equity payment and the paychecks, I

3     grant you that, but that money's coming from Rhode

4     Island.  So I'm not sure that qualifies as Mr. Brown

5     injecting himself into the economy of Rhode Island.

6     You have him coming to Rhode Island on that one

7     occasion.  I think that, I would agree with you, is

8     injecting himself into the market or the economy of

9     Rhode Island.  He's in the state, he's physically in

10    the state when he's here doing that, but his work, the

11    actual work he's doing, is not injecting itself into

12    the Rhode Island economy.

13          So it's a pretty thin read.  I mean, I agree

14    with you; it's foreseeable that sitting out there in

15    Seattle, Mr. Brown might say, well, now -- after CVS

16    acquires Aetna, he says, well, if I ever get sued by

17    CVS, they'll probably sue me in Rhode Island.  I can

18    grant you that much.  But I'm not sure where I see the

19    sort of purposeful injection of him into the economy of

20    the state.

21          MR. CUNNINGHAM:  I think that's where the equity

22    grant comes into play, your Honor.  He accepted a

23    hundred-thousand dollars worth of equity in a company

24    that's domiciled in Rhode Island and as a principal

25    place of business in Rhode Island.  I think that

1  injects you into that economy.  It wasn't Aetna any

2  longer.  And everyone knew it wasn't Aetna any longer.

3  That transaction took place back in 2018.  So he

4  agreed --

5      THE COURT:  Okay.  So you're saying now that he

6  is a stock owner of a Rhode Island corporation, he's

7  become part of the economy of Rhode Island.

8      MR. CUNNINGHAM:  Correct, your Honor.

9      MR. McDOUGALD:  Your Honor, that's an argument

10  that will put us all subject to personal jurisdiction

11  wherever we own stock.

12      THE COURT:  That's an extension of personal

13  jurisdiction.  That's, you know, a serious question.

14  Do you know of any case that holds that ownership of

15  stock or accepting a stock option in a company by

16  itself creates personal jurisdiction in that court, the

17  court wherever that company is located?

18      MR. CUNNINGHAM:  I'm not.  To be sure, we'll

19  look, your Honor.  But I don't think those are the

20  circumstances here.  This wasn't a day trader

21  purchasing stock of a Cayman Islands company or a Texas

22  company.  This was somebody whose company, Aetna, was

23  acquired by CVS, and he was being offered stock in that

24  new company in his ultimate employer because it's the

25  holding company of Aetna.  He knew that, and he agreed

1    to enter into that transaction and to enter into the

2    contract with CVS and agree that Rhode Island law would

3    apply to that contract.

4          That's much different than purchasing some

5    stock, you know, in some random company that you have

6    no other connection to.  I think it's completely

7    different.

8          THE COURT:  Okay.  All right.  Well, I thank you

9    both for your arguments.  I'm going to try to get you a

10   decision quickly on this jurisdictional issue so that

11   we can, you know, march forward one way or the other.

12         MR. McDOUGALD:  Understood, your Honor.

13         MR. CUNNINGHAM:  Your Honor, I have to ask,

14   because we are here on a TRO proceeding today, you

15   know, we will be very concerned if we're leaving this

16   hearing today without some kind of assurance that in

17   the interim Mr. Brown isn't going to run to Cigna and

18   start working there this evening.

19         THE COURT:  Well, it's a good question.  I'm

20   reluctant to give you any kind of an order if I haven't

21   decided whether I have personal jurisdiction or not.

22   And that's my hesitation.  But it's a good question for

23   Mr. McDougald.

24         MR. McDOUGALD:  No.  They have offered some, in

25   our discussions, some limited ability for Mr. Brown to

1    work.  And I think at least in the interim that would

2    be a start.  But it would have limits.  But I think the

3    things we've been talking about will be sufficient so

4    he's not going to go beyond what we've talked about.

5    And I will get Mr. Cunningham's agreement before he

6    walks in -- I guess, virtually walks into the office

7    door.  But I would expect him to be able to do that in

8    the next day or two.

9         Mr. Cunningham, my goal would be to let him do

10   the things we've talked about and not do the things

11   you're most concerned about.  If we don't come to an

12   agreement, then he won't do it, but my expectation is I

13   think we had four categories we agreed on, two we had

14   not.  I think we could be able to agree to those four

15   categories to start and then wait for the Court's order

16   and take the next step.

17        MR. CUNNINGHAM:  Okay.  I'm not sure that we

18   agreed on four, but I'm happy to discuss this.  What I

19   heard is if we can't come to an agreement, at least in

20   this very short time period, Mr. Brown wouldn't do

21   something we haven't agreed to.  So that works for now

22   so I appreciate it.

23        MR. McDOUGALD:  Okay.

24        THE COURT:  Okay.  Good.  All right.

25        Well, thanks very much.  We'll let you go, and

1    you'll hear from me soon.

2            MR. CUNNINGHAM:  Thank you very much, your

3    Honor.

4            MR. McDOUGALD:  Thank you.

5            THE COURT:  Thank you.

6            (Time noted; 3:59 p.m.)

1          I, Lisa Schwam, CRR-RPR-RMR, do hereby

2     certify that the foregoing transcript is a correct

3     transcript *of a remote video conference* prepared to the

4     best of my skill, knowledge and ability of the

5     proceedings in the above-entitled matter.

6

7     /S/ Lisa Schwam

8     Lisa Schwam, CRR-RPR-RMR            Date:
       Federal Official Reporter          March 8, 2021
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25